IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  v.<br><br>MICHAEL ANTHONY BARR and<br>NADYA IVETTE DIAZ,<br><br>  Defendants. | CIVIL ACTION FILE<br><br>NO. 4:17-CR-0038-HLM-WEJ |

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendants' Motions to Suppress Evidence [21, 71]. Defendants, Anthony Michael Barr and Nadya Ivette Diaz, contend that law enforcement officers illegally searched their Mitchell Bridge Road home on August 31, 2017 during Mr. Barr's arrest on outstanding warrants. Thus, they assert that all evidence seized following that search must be suppressed. On May 14, 2018, the Court conducted an evidentiary hearing [28], which has been transcribed [34]. The parties have briefed the issues raised. (Gov't Br. [70]; Def. Barr Resp. [73]; Diaz Mot. Suppress [71]; Diaz Br. [82].) For the reasons explained below, the undersigned **RECOMMENDS** that both Motions be **DENIED**.

I.      **THE SUPERSEDING INDICTMENT**

On June 12, 2018, a grand jury in the Northern District of Georgia returned an nine-count Superseding Indictment [1] against defendants Barr and Diaz, charging that they knowingly and willfully conspired, in violation of 18 U.S.C. § 371, for Mr. Barr to possess firearms after having been convicted of a felony, in violation of 18 U.S.C. §§ 2 and 922(g)(1).  In addition to charging Mr. Barr as a felon in possession, the Superseding Indictment charged him with possession of a silencer that was not registered to him, in violation of 26 U.S.C. §§ 5861(d), 5845(a)(7), and 5871, possessing a shotgun with a barrel of less than 18 inches in length, in violation of 26 U.S.C. § 5861(d), 5845(a)(2), and 5871, possessing a firearm while being an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3), and unlawfully using the identify of "C.F." to obtain a temporary motor vehicle registration in violation of Georgia law O.C.G.A. § 16-10-71 and 8 U.S.C. § 1028(a)(7).  The Superseding Indictment also contained a forfeiture provision.

## II.  STATEMENT OF FACTS

During the summer of 2017, the Whitfield County Sheriff's Office ("WCSO") became aware that Mr. Barr was living at 4979 Mitchell Bridge Road as a fugitive[1] under the assumed name "Carlos Fonseca." (Tr. 5-14.) Ms. Diaz also resided on the thirty-acre property, which included pasturelands, woodlands, a pond, a shooting range, and multiple outbuildings. (Id.)

Mr. Barr came to the attention of the WCSO when Sergeant Wes Gibson and a family member, who knew Mr. Barr as "Carlos," began working for him part-time caring for and shoeing horses. (Tr. 6-7.) Sergeant Gibson noticed that defendants spent large amounts of money on the farm but declined to say how they made their money. (Id. at 7.) Sergeant Gibson had seen Mr. Barr with a Glock pistol on his side and saw a hunting rifle in the house on one occasion. (Id. at 6, 51-52.) Defendants distanced themselves from Sergeant Gibson when they learned that he worked for the WCSO. (Id. at 7.) Sergeant Gibson later shared what he had seen with Sergeant Daniel Rann, who was called to the property when horses

---

[1] Mr. Barr was the subject of arrest warrants issued by the City of Sandy Springs for a violation of the Georgia Controlled Substance Act and felon in possession of a firearm, as well as a probation/parole warrant. (Tr. 10.)

3

escaped the fenced area and discovered that a vehicle on the property was not registered to that address. (Id. at 8.)

In March 2017, Deputy Chip Hackney received information that Mr. Barr lived on the property, was the subject of outstanding warrants, and had domestic violence issues with Ms. Diaz. (Tr. 8-9.) Deputy Hackney visited the residence several times and encountered defendants separately, both of whom retreated into the house. (Id. at 9-10, 68.) During one incident on August 11, Deputy Hackney observed an empty holster on Mr. Barr's side. (Id.)

Around mid-August 2017, Detective Rickey Holmes became the lead officer on the investigation. (Tr. 5-6,11.) He obtained a photograph of Mr. Barr from the Department of Corrections and the Department of Motor Vehicles. (Id. at 11.) On August 23, Detective Holmes and Detective Cameron Cox went to the property in plain clothes and knocked on the back door of the home hoping to confirm Mr. Barr's identity. (Id. at 11-14.) Mr. Barr answered the door, identified himself as "Carlos," and engaged in a discussion with the detectives about buying or renting goats. (Id. at 12-13.) Mr. Barr wore an empty holster on his hip and, after the encounter, Detective Holmes was certain that they had positively identified him. (Id. at 13-14.)

On August 31, 2017, Detective Holmes led an operation to arrest Mr. Barr on the outstanding warrants. (Tr. 14-16.) Because Mr. Barr kept firearms in the residence, Detective Holmes planned to conduct a traffic stop on him after he left the property.[2] (Id. at 15.) Before the operation, Detective Holmes briefed the law enforcement team regarding Mr. Barr's history of firearms violations, felony obstruction, narcotics violations and the events leading up to the planned arrest. (Id. at 14-16, 74.)

Surveillance on the 4979 Mitchell Bridge Road property began at 8:00 a.m. (Tr. 16.) At 10:20 a.m., officers observed Mr. Barr outside the residence attempting to corral a horse into a fenced pasture. (Id. at 16-19; Gov't Ex. 1, at 10:21:02.) Detective Holmes gave the order to take Mr. Barr into custody. (Tr. 19.) Officers arrested Mr. Barr and placed him in flex ties next to a gated-entrance to the pasture a short distance from the house. (Tr. 19-22; Gov't Ex. 1, at 10:21:50-10:22:23.) As Mr. Barr was being handcuffed, Detective Holmes introduced himself and advised Mr. Barr of his Miranda rights. (Tr. 22, 69; Gov't Ex. 1, at 10:22:15-10:22:40.) Detective Holmes asked Mr. Barr his name and he responded, "I, uh, I

---

[2] A fence post facing the property's driveway displayed a sign with a picture of a rifle and ammunition stating: "WARNING. DUE TO PRICE INCREASE OF AMMO DO NOT EXPECT A WARNING SHOT." (Tr. 21-22; Gov't Ex. 3.)

obviously need an attorney. I mean, I don't even know what this is about, sir . . . ." (Gov't Ex. 1, at 10:22:40-10:22:52; see also Tr. 22-23, 69.) When asked if he was Michael Anthony Barr, Mr. Barr declined to answer and asked, "What in the world is this?" (Gov't Ex. 1, at 10:22:52-10:22:59.) Mr. Barr then engaged in a short conversation regarding the reason for the arrest and his identity, and stated that he recognized Detective Holmes, who acknowledged that he had "come up here asking about a goat the other day." (Id. at 10:23:05-10:23:55; see also Tr. 21.) Detective Holmes again asked Mr. Barr if he was indeed Michael Anthony Barr, and he shook his head in the negative. (Gov't Ex. 1, at 10:23:05-10:24:04.) An officer then requested a transport unit be brought to the scene. (Id. at 10:24:04-10:24:25; see also Tr. 24.)

During Mr. Barr's arrest a man named Michael Hawkins who was holding a goose approached the officers, and Detective Holmes walked up the driveway to speak with him. (Tr. 23-24; Gov't Ex. 1, at 10:24:35-10:24:57.) Mr. Hawkins stated that he and his daughter Ashley were the only other people on the property. (Tr. 67; Gov't Ex. 1, at 10:24:40-10:24:45.) Captain Shannon Ramsay with the Murray County Sheriff's Office told Detective Holmes that he did not know if anyone was in the house, but that no one was coming to the door. (Gov't Ex. 1, at 10:25:08; Tr. 67-68.)

6

Detective Holmes walked back down the driveway to where Mr. Barr was standing with Deputy Thompson and asked Mr. Barr if he had identification on him. (Tr. 75.) Mr. Barr had sweat dripping in his eye and Deputy Thompson asked him if there was someone in the house who could get him something to wipe his face. (Id. at 42.) Mr. Hawkins approached, and Deputy Thompson asked him to wipe Mr. Barr's face. (Id.; Gov't Ex. 1, at 10:26:00-10:26:03.) Mr. Hawkins then asked Mr. Barr if everything was okay. Mr. Barr responded, "I don't know. Can you do me a favor, um, in the bedroom, can you just grab my phones? Two phones." (Gov't Ex. 1, at 10:25:05-10:25:14; see also Tr. 25, 44.) The two discussed where the phones were located, and Detective Holmes told Mr. Barr, "We're going to escort him in there to get your stuff. We don't want him going in there and . . . ." (Gov't Ex. 1, at 10:26:26; see also Tr. 25, 45-47, 70.) Mr. Hawkins then asked, "Does [Ashley] know which one is your bedroom?" Mr. Barr responded, "Huh?" and Mr. Hawkins repeated his question. Mr. Barr replied, "They [the phones] should be right on the bed." (Gov't Ex. 1, at 10:26:26-10:26:35; see also Tr. 25, 44, 46-47.) Mr. Hawkins said, "Okay," and began walking up the hill to the back door of the house accompanied by Detective Holmes. (Tr. 26.) Captain Ramsay and Detective Cox joined the two men as they walked into the house. (Id. at 26, 53.) Mr. Barr made no further statements at that time. (Id. at 26, 76-77.)

Upon entering the home, Detective Holmes observed bullets on the table next to the back door and asked Mr. Hawkins, who had been leading the way, to step aside. (Tr. 26, 55.) According to Detective Holmes, he asked Mr. Hawkins to step aside for safety reasons because there were no lights on in the room, he could not tell if there was anyone else in the home, he knew Mr. Barr had guns, and he had just seen ammunition. (Id. at 26-28.) When Detective Holmes entered the bedroom, he saw a rifle and the phones on the bed and a pistol on the nightstand. (Id. at 27-28.) Detective Holmes announced, "You know what? Sir, this is what we are going to do. We are going to get out of the house since there's guns and stuff here and we're not going to get . . . [Mr. Barr] can wait on getting his phones . . . there's guns back there so I don't want you digging around and stuff." (Gov't Ex. 1, at 10:28:21-10:28:35; see also Tr. 56.) The officers left the contraband and cleared the home to make sure there was no one inside who could walk out with a gun. (Govt's Ex. 1, at 10:28:35-10:29:36; Tr. 28, 60-61.)

Upon exiting the home, Detective Holmes explained to Mr. Barr that they did not retrieve his phones because there were "guns all over the house." (Gov't Ex. 1, at 10:29:39-10:29:49; see also Tr. 28-29.) Mr. Barr again asked for his phones repeatedly so that he could call an attorney. (Tr. 29, 56-57, 78-79; Gov't Ex. 1, at 10:29:49-10:30:35.) The officers explained that eventually they would

8

bring Mr. Barr his phones.  (Tr. 32, 56-57; Gov't Ex. 1, at 10:30:35-10:30:37.) Officers subsequently obtained a search warrant from a state court judge and seized the items listed in the Superseding Indictment.  (Tr. 56-57.)

### III.   MOTIONS TO SUPPRESS EVIDENCE

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  A search conducted without a warrant issued upon probable cause is per se unreasonable, subject only to a few specifically established and well-delineated exceptions.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Id.; see also McClish v. Nugent, 483 F.3d 1231, 1240 (11th Cir. 2007).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).  In considering whether consent to search was voluntarily given, the Court examines the totality of the circumstances. United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995).  Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of

9

acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'" United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989)). "A consensual search is confined to the terms of its authorization." United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990).

The Eleventh Circuit has identified a non-exhaustive list of relevant factors to consider when assessing whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. Blake, 888 F.2d at 798-99; see also United States v. Simms, 385 F.3d 1347, 1355 (11th Cir. 2004).

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). It is only justified when there is reasonable suspicion that the area to be swept harbors an individual dangerous to the police. See United States v. Delancy, 502 F.3d 1297, 1307 (11th

Cir. 2007).  A protective sweep should last "no longer than is necessary to dispel the reasonable suspicion of danger," "may extend only to . . . those spaces where a person may be found," and must last "no longer than it takes to complete the arrest and depart the premises." Buie, 494 U.S. at 335-36.

In facts analogous to this case, the Eleventh Circuit found that the arrestee voluntarily consented to allow officers into his residence when he asked them for permission to enter the home to get a shirt and shoes and informed them that his girlfriend was inside. United States v. Wright, 324 F. App'x 800, 801-03 (11th Cir. 2009) (per curiam).  The officers agreed but because they knew the arrestee had previously kept weapons in the home, they escorted the girlfriend to the back of the house to retrieve the items and conducted a protective sweep. Id. at 801.  Furthermore, the Eleventh Circuit found the officers' protective sweep of the home was constitutional because there was a possibility that weapons were inside the home and there was another person present, i.e., the girlfriend. Id. at 803.

The record here shows that, after arresting Mr. Barr, Detective Holmes Mirandized him.  Mr. Barr then stated that he needed an attorney and later asked Mr. Hawkins to retrieve his cell phones, which he might use to call an attorney.  After Mr. Barr gave directions to Mr. Hawkins as to where the phones were located, Detective Holmes explained to Mr. Barr that officers would have to escort Mr.

11

Hawkins in the house for safety reasons. Mr. Barr did not object but continued to instruct Mr. Hawkins as to the location of the cell phones. Likewise, he said nothing when Mr. Hawkins entered the house with the officers behind him. Mr. Barr's assertion that Detective Holmes unilaterally "claim[ed] authority" to enter the home and that he believed he had no right to resist is not well taken. Indeed, when the group emerged from the home without the cell phones because there were guns and ammunition in plain sight throughout, Mr. Barr repeatedly asked that they return and retrieve his cell phones.

Furthermore, like the defendant in Wright, Mr. Barr was known to have previously kept weapons in the home. On that basis, the officers properly escorted Mr. Hawkins, who was unknown to them, for safety reasons and made a protective sweep of the home for their safety after seeing bullets and guns in plain view. It is irrelevant whether officers believed that Mr. Hawkins was a danger to them given the circumstances, i.e., there were weapons and ammunition in plain view and the officers had no way of knowing whether Ms. Diaz was in the residence or if anyone else other than Mr. Hawkins and his daughter were visiting Mr. Barr that day. Notably, even Mr. Hawkins was concerned for his own safety while leading the way through the house. (See Gov't Ex. 1, at 10:27:10-10:27-18 (after being asked to step aside, Mr. Hawkins stated: "When you're dressed like this, I don't want to

be in the front. I want to be dressed like that.").) Additionally, the sweep did not last longer than necessary, as the officers exited the home after locating the cell phones near weapons in Mr. Barr's bedroom and determining that it was too dangerous to allow Mr. Hawkins to retrieve the cell phones.

Thus, there is no evidence that the officers coerced Mr. Barr to gain entry to the home for the purposes of conducting an illegal search. Rather, Mr. Barr voluntarily consented to the officer's entry into the home so that Mr. Hawkins could retrieve the cell phones that Mr. Barr could use to call an attorney. Clearly, Mr. Barr made the determination that calling an attorney was more important than excluding the officers from the house. Based on the totality of the circumstances, Mr. Barr voluntarily consented to allow officers to accompany Mr. Hawkins into the house to retrieve his cell phones. Therefore, the undersigned **REPORTS** that the officers had a legal right to enter the home and walk to the bedroom, as Mr. Barr had instructed, and that the officers did not conduct an unconstitutional search of the house while making a protective sweep. Accordingly, the undersigned **RECOMMENDS** that defendants' Motions to Suppress Evidence be **DENIED**.

## IV. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendants' Motions to Suppress Evidence [21, 71] be **DENIED**.

**SO RECOMMENDED**, this 17th day of October, 2018.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE